IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| GEORGE MONTGOMERY BAYLOR, M.D., ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 7:09cv00472 |
| ) | |
| v. ) | |
| ) | |
| COMPREHENSIVE PAIN MANAGEMENT ) | By: Hon. Michael F. Urbanski |
| CENTERS, INC., <u>et al.</u>, ) | United States Magistrate Judge |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff George Montgomery Baylor, M.D. ("Dr. Baylor") has raised multiple concerns regarding document discovery and interactions with witnesses in this case. As sanctions therefor, Dr. Baylor seeks the entry of default judgment on his breach of contract claim, as well as the imposition of attorney's fees and costs against defendants Comprehensive Pain Management Center, Inc. ("CPMC"), Gunasiri Samarasinghe, M.D. and Kathleen Samarasinghe (referred to herein, collectively, as "defendants"). There are no sanctions motions pending against defendant Michael T. Kelly, D.O.

Dr. Baylor worked as a pain management physician at CPMC from April, 2004 until December 31, 2005, when his Employment Agreement with CPMC expired and he went on military leave. Despite the expiration of his Employment Agreement, CPMC held Dr. Baylor's position open for him during his military service, and he returned to CPMC on April 10, 2006. Dr. Baylor's return to the practice was fraught with difficulties, and factual issues abound as to the reasons for this tension. Matters came to a head on May 1, 2006, when Dr. Baylor was fired after an expletive-laced exchange with Dr. Samarasinghe.

At the core of this case is Dr. Baylor's claim that he was shorted on a claimed production bonus under his Employment Agreement. In addition to his $230,000 salary, the Employment Agreement provides that Dr. Baylor was to "receive production bonuses so that his compensation package including salary, benefits and bonuses shall equal 50% of the total receipts generated by the Employee for each twelve-month period beginning on the date of initial employment." CPMC's Summ. J. Br. (Dkt. #102), at Ex. 1. The parties disagree as to what ought to be included in the calculation of "total receipts generated by the Employee."

# I

Dr. Baylor filed suit in Roanoke County Circuit Court in 2007, and the case progressed slowly. Dr. Baylor contends that CPMC and the Samarasinghes were not forthcoming with discovery. Indeed, most of Dr. Baylor's early discovery efforts met with objections. In 2008 alone, Dr. Baylor was forced to schedule five motion to compel hearings, and each time the Roanoke County Circuit Court ordered CPMC and the Samarasinghes to respond to plaintiff's discovery requests. Defendants' discovery intransigence transcended mere objections. For example, defendants refused to agree to the text of a proposed order resulting from an October 28, 2008 Motion to Compel hearing, requiring counsel for Dr. Baylor to schedule a hearing with the Roanoke County Circuit Court to get the proposed order entered, which did not happen until March 2, 2009. The pattern of objections, delays and unnecessary discovery disagreements continued throughout 2009 when the case was removed to federal court.

Discovery problems continued following removal. Dr. Baylor moves for default judgment and other sanctions for the discovery problems he experienced in federal court, which are briefly summarized as follows.

### A. The Production Data Issue

Discovery difficulties have haunted this case from the outset, principally concerning the physician production bonus issue. Dr. Baylor claims that defendants have failed to properly bill and collect for his services through mismanagement and manipulation of CPMC's billing records, depriving Dr. Baylor of his production bonus. Dr. Baylor asserts that his efforts to ascertain the true financial picture of CPMC's business have been thwarted and that defendants have obstructed and delayed discovery on this central issue. Even though ultimately over 30 boxes of billing records were produced by CPMC, Dr. Baylor complains that they were disorganized and grossly incomplete. For its part, CPMC states that while mistakes have been made, Dr. Baylor has had access to the full scope of its financial documents, including a detailed Transaction Journal. Defendants assert that the Transaction Journal "provides a breakdown of each and every charge for each and every procedure on every patient seen at CPMC from May, 2004 through December 31, 2005, as well as the amounts billed, the amounts collected and the amounts written off."[1] Defs' Br. In Opp. to Sanctions (Dkt. #105), at 4. In addition, pursuant to a state court order, Dr. Baylor's expert has had full access to CPMC's Lytec financial accounting system.

Pursuant to a Roanoke County Circuit Court Order dated March 2, 2009 granting one of Dr. Baylor's motions to compel, CPMC produced on May 22, 2009 a "Practice Analysis - Charges" report for Dr. Baylor covering the period of May 2004 through December 2006 (hereinafter referred to as the "May 2009 Report"). Dr. Baylor provided this report to his expert witness, and his expert relied on that data in his expert report dated June 22, 2009. Because the May 2009 Report was produced by counsel for CPMC in letter, as opposed to pleading, form,

---

[1] CPMC submitted the last twelve pages of this report for the court's review, which appears at Docket #125.

Dr. Baylor subsequently sent a request for admissions to confirm that it was both accurate and created by CPMC. On August 10, 2009, CPMC denied that the May 2009 Report it had produced was accurate, and instead produced a new "Practice Analysis – Charges" Report (hereinafter referred to as the "August 2009 Report"). CPMC asserts that the May 2009 Report is erroneous in that it grossly overstates receipts for five of the nineteen months in the period covered by the report.[2]

Dr. Baylor filed a motion for sanctions in state court seeking to bind CPMC to the numbers in the May 2009 Report or alternatively to require CPMC to pay Dr. Baylor's expert expenses associated with determining the true financial picture of CPMC. The Roanoke County Circuit Court allowed an expert engaged by Dr. Baylor, Neal Lawson of Intelligent Discovery Solutions, Inc. ("IDS"), to access CPMC's Lytec financial accounting data base, and took the issue of sanctions under advisement. Such was the state of discovery on the production bonus issue when the case was removed to federal court at the end of 2009.

Much of 2010 was consumed with efforts by Dr. Baylor to access and review the CPMC Lytec database. Problems were encountered because the data was encoded in an unreadable format, and CPMC claimed it did not know the access code. Dr. Baylor's database expert, IDS, identified three solutions to this problem, but CPMC would not agree to any of them. In a hearing held on September 22, 2010, the court decided that Dr. Baylor could employ any of the three solutions proposed by IDS to obtain the data. Ultimately, after analyzing the data, Neal

---

[2] To say that the figures for the five months in question are strikingly different in the May and August 2009 Reports significantly understates the magnitude of the disparity between the two reports. In fact, the differences in the two CPMC reports jump off the page. With the exception of the five months at issue, CPMC's monthly receipts in 2004 and 2005 all fall below $100,000.00. In contrast, the spreadsheet prepared by Dr. Baylor's expert, Michael Stearns, contains monthly receipt numbers for these five months ranging between $488,810 and $961,268. See Stearns Dep. at Ex. 16. Frankly, the figures for these five months are so grossly out of line with the other monthly receipt numbers that they appear incredible. CPMC argues that the report was erroneously prepared by a CPMC employee and was not reviewed prior to production by Mrs. Samarasinghe. Even Stearns, Dr. Baylor's expert accountant, stated in his professional opinion that there is a mistake in the May 2009 Report. Stearns Dep. at 193.

Lawson of IDS submitted a declaration calling into question "the quality, accuracy, and reliability of the CPMC data." Stearns Dep. at Ex. 10.

### B. CPMC's Failure to Identify Frank Dieter and Mary Innes

Frank Dieter is a medical practice consultant who provided, on a contract basis, medical practice administration services to CPMC from October 19, 2009 until July 14, 2010. Mary Innes was his colleague working with him on the CPMC account. Dieter and Innes had a broad range of responsibilities for CPMC, including managing its billing and collections, and they were involved in the conversion of an older to a newer version of the Lytec system. Dr. Baylor asserts that discovery served as early as May 9, 2007 required CPMC to identify Dieter and Innes. Principally because Dieter's tenure at CPMC did not overlap with Dr. Baylor's by several years, and because Dieter and Innes were not employed by CPMC until two years after the initial state court discovery in this case, CPMC excuses its failure to identify Dieter or Innes as persons with knowledge or witnesses.

In late October, 2010, Dr. Baylor learned of Dieter by happenstance, and on December 6, 2010, Dr. Baylor moved for leave of court to take his deposition after the discovery cutoff. Dr. Baylor argued that Dieter had detailed knowledge of the CPMC billing and collections systems at the core of this case. CPMC agreed that Dieter had relevant information and did not oppose the motion. After a hearing, pretrial deadlines were adjusted to allow Dieter and his colleague Innes to be deposed. Dieter was served with a subpoena duces tecum and was deposed on December 15, 2010.

The Dieter deposition was a revelation to Dr. Baylor, as Dieter was heavily involved in the financial management of CPMC, including the Lytec system. Dieter identified a number of problems with CPMC's billing and financial management practices. Dr. Baylor asserts that Dieter ratified the position taken by Dr. Baylor's expert witnesses on the issue of the proper

calculation of his production bonus. Dr. Baylor characterized Dieter's deposition testimony as follows:

> Mr. Dieter's deposition testimony reflects that he had intimate knowledge of CPMC's billing and collection practices, including those practices employed since the time of Dr. Baylor's employment in 2004. His testimony reflected his knowledge of improper billing for Dr. Samarasinghe while he was in Sri Lanka (Dieter Dep. Ex. 35), poor record maintenance (Dieter Dep. at 223), poor financial management reflected in comingling of personal and business expenses (Dieter Dep. at 186), significant discrepancies between the bank records and patient billing records in Lytec (Dieter Dep. at 198; Dep. Ex. 40), significant delays in posting of receipts to patient accounts (Dieter Dep. at 167), policies of improper incident-to billing for Dr. Baylor's services under Dr. Samarasinghe's billing numbers (Dieter Dep. at 117), improper account maintenance (Dieter Dep. at 200), and improper handling of cash (Dieter Dep. at 176), among other things. Moreover, he had knowledge that CPMC was improperly skewing the calculation of physician bonuses by failing to include for charges billed under the physician's billing numbers for supervision of physician assistant services and supplies. (Dieter Dep. at 88-89, 165-67, 222; Dieter Dep. Ex. 21).

Baylor Show Cause Memorandum (Dkt. # 126), at 1-2.

Despite Dr. Baylor's efforts dating back to the outset of this case in 2007 to discover the persons at CPMC having knowledge of and involvement with the Lytec billing system, neither Dieter nor Innes was identified in discovery. But Dieter was well known to the Samarasinghes, as he served as CPMC's practice management consultant in 2009 and 2010. Further, he was well acquainted with CPMC's trial counsel and had communicated with counsel on the central issue of this case, the proper calculation of physician production bonuses, albeit as regards another physician. Also troubling is Dieter's revelation that when Dr. Baylor's counsel and computer expert were scheduled to appear at CPMC to extract data from the Lytec system, counsel for CPMC instructed Dieter to leave the premises. Counsel for defendants has countered that no improper inference should be drawn from this instruction, as the computer data review was done

6

after hours and to minimize interference, counsel asked that only Teresa McLeod, the CPMC employee most familiar with Lytec, be present.

### C. CPMC's Documents in Dieter's Possession Not Previously Produced

In response to the subpoena <u>duces</u> <u>tecum</u>, Dieter provided a number of documents relevant to this case that had not been produced by CPMC. Upon leaving CPMC on July 14, 2010, Dieter wrote a letter to Dr. Samarasinghe that bears directly on the issues in this case. In that letter, Dieter raised concerns regarding CPMC's billing practices, including billing of charges by a new physician lacking a provider number under another doctor's billing number and problems reconciling bank deposits to amounts reflected in the Lytec reports. Dieter attached to his letter two CPMC billing memoranda entitled "Posting Procedures" and "Miscellaneous Notes." The "Miscellaneous Notes" memorandum expressly mentions billing procedures involving Dr. Baylor. According to Dieter, these memoranda were located on the CPMC computer system under "Gayle's Folder\Posting Manual" and "Gayle's Folder\Research Manual" directories. Although plainly responsive to discovery requests in this case, Dr. Samarasinghe did not provide the letter and the attached billing memoranda to his counsel. Instead, he put it in his desk drawer and gave a copy to his new billing manager to investigate. When the issue of "Gayle's Folder" was first raised in court at a show cause hearing held on January 4, 2011, CPMC stated that it did not have an employee by that name and did not know whose folder that was. Later, CPMC produced an employee directory listing "Gayle (Linda) Dillon," and admitted its earlier representation was mistaken.

Discovery in this case was largely completed before Dr. Baylor learned of these documents. In particular, the deposition of Kay O'Connell, CPMC's former practice administrator was taken some two years earlier. Dr. Baylor asserts that certain of the late-breaking Dieter documents directly contradict O'Connell's testimony. However, because

7

O'Connell has now relocated and was last known to be living in Texas, she is beyond the subpoena power of the court. Dr. Baylor claims prejudice associated with not being able to examine O'Connell about these documents.

### D. Alleged Pressure Applied to Dieter Before and at His Deposition

In addition to the failure to identify Dieter and produce relevant documents that ultimately came to light as a result of the subpoena issued to him, two other troubling issues concerning CPMC's counsel's interaction with Dieter surfaced surrounding his deposition. First, prior to his deposition, CPMC retained Peter Sullivan, a private investigator, to do a background investigation on Dieter. Dieter complained to counsel for Dr. Baylor that Sullivan had called some of Dieter's clients and, among other things, told them that he was checking Dieter's background. It was reported to Dieter that Sullivan said he was working for an attorney on a case involving a problem with a former Dieter client. Dieter, upset by this report, contacted Dr. Baylor's counsel and said that he did not want to be deposed. Dieter testified that he felt intimidated and scared by the fact that the private investigator was contacting his clients about a lawsuit and questioning them about his background.[3]

After speaking with counsel for Dr. Baylor, Dieter agreed to go forward with his deposition. However, at the outset of his deposition, counsel for CPMC warned Dieter that "he had a confidentiality agreement with CPMC and depending upon what he would testify to during his deposition and depending on what was in the stack of documents that he brought to produce, CPMC would enforce its rights against him." Baylor's Sanctions Br. (Dkt. # 93) at 17-18. Dieter testified at the show cause hearing that he recalled CPMC's counsel stating that CPMC wanted to reserve the right to pursue him personally for violating his confidentiality agreement

---

[3] It is difficult for the court to fathom a legitimate reason for CPMC's investigation of Dieter, as Dieter already was well known to CPMC, the Samarasinghes and their counsel, having served as CPMC's practice management consultant during 2009 and 2010.

with CPMC by testifying. Counsel for CPMC characterized the exchange as reflecting her concern that the box of documents Dieter brought with him to the deposition may contain confidential information, including patient specific information, which CPMC had a duty and interest to protect. Regardless of the exact words used by counsel for CPMC, Dieter felt intimidated, and announced that he was "done here" and was not going to testify. At that point, the parties called the court. The court ordered that the Dieter deposition should proceed under the aegis of the existing protective order, and indicated that it was scheduling a show cause hearing concerning the actions of the private investigator and CPMC's counsel regarding Dieter. Dieter testified that once the court ruled that he could testify pursuant to the protective order, he no longer felt intimidated. Dieter added that neither the actions of the investigator nor the statements of counsel for CPMC at the outset of the deposition affected the substance of his testimony.

A show cause hearing was held on January 4, 2011, at which time new counsel for Dr. Kelly and additional new counsel for CPMC and the Samarasinghes appeared. The court heard argument and evidence from Dieter, Dr. Baylor, Sullivan and the Samarasinghes on the show cause issue. For his part, investigator Sullivan testified that he was asked to do a routine background investigation on Dieter and Innes, including verifying information by searching public records and contacting former employers. Sullivan called a number of Dieter's former employers and said that he was working for an attorney in a civil case and was checking on Dieter because he was a potential witness in the case.

Inasmuch as a settlement conference had been scheduled within a few days of the show cause hearing, the court took the issue of any necessary sanctions under advisement. Given the new documents uncovered in the Dieter subpoena that should have been produced previously by CPMC, the court ordered counsel for CPMC and the Samarasinghes, including their new

9

counsel, to certify that they had reviewed defendants' paper and computer files and that all materials responsive to plaintiff's discovery requests had been produced. In addition, the court ordered production of all materials located in the "Gayle's Folder" on the CPMC computer system. Certainly, the court understood at that time that the efforts leading up to this certification would result in significant additional costs to defendants. As the court stated at the hearing, the point was to make sure that all documents relating to the issues in this case had been produced.

Ultimately, the certifications were filed and additional documents were produced. The certifications stated that counsel reviewed fifteen computer hard drives located at CPMC, a copy of CPMC's data server, six computer hard drives retrieved from CPMC's storage closet, and paper records from CPMC's offices and conference rooms. Counsel purchased specialized software and performed forensic scans on CPMC's entire data server as well as on the six computer hard drives removed from CPMC's storage. The computer data analyzed contained over 15.4 gigabytes, which included over 109,900 individual files contained in approximately 34,370 different file folders. In all, counsel spent approximately 100 hours reviewing CPMC's computer and paper records leading up to the certification. While counsel could not guarantee that all discoverable information had been produced from the universe of information in the possession of CPMC and the Samarasinghes, counsel certified that a good faith effort had been made to comply with the discovery requests and orders and that additional materials had been produced. Discovery Certifications (Dkt. #74-76).

### E. More Late Documents, Rule 30(b)(6) Deposition Problems and Another Investigator Complaint

The new documents produced pursuant to the certification process spawned other discovery problems. Included in the new materials produced was a patient referral log kept by

former CPMC practice administrator Kay O'Connell, which ostensibly indicated which CPMC physician new patients were assigned to see. Dr. Baylor contends that how new patients were allocated between CPMC physicians bears on the production bonus issue. The patient referral log was described as being a 50-page electronic document. Because this log was not produced until 2011, Dr. Baylor was not able to ask O'Connell about it when she was deposed in 2008. Also highlighted by Dr. Baylor was a letter written to CPMC indicating that he had hospital privileges in North Carolina in June, 2006, which is inconsistent with the testimony of the CPMC witnesses that they did not know where Dr. Baylor was at that time. As a result, Dr. Baylor requested and was granted leave to take a Rule 30(b)(6) deposition of CPMC concerning the newly produced documents. At the Rule 30(b)(6) deposition, CPMC's corporate designee, Mrs. Samarasinghe, described the lengths to which counsel searched for additional documents at CPMC's offices, but had little, if any, information of her own about the new documents produced.

Dr. Baylor next raised another issue concerning a witness interview conducted by private investigator Sullivan, this time contending that Sullivan represented himself as working for Dr. Baylor while conducting an interview of a potential Dr. Baylor witness, Antoinette Drummond. A hearing on the sanctions issues was held on February 9, 2011. At that hearing, investigator Sullivan denied that he identified himself as working for Dr. Baylor, and a recording of the statement he took from Drummond was played. The recording contained no identification of Sullivan, as the investigator testified he identified himself before he turned the recorder on.

## II

Federal Rule of Civil Procedure 37(c) addresses appropriate sanctions for failure to disclose or supplement discovery responses. That rule provides as follows:

> (1) Failure to Disclose or Supplement.

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and giving an opportunity to be heard:
>
> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
>
> (B) may inform the jury of the party's failure; and
>
> (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Rule 37(b)(2)(A)(i)-(vi) authorizes a court to issue orders (i) directing that facts be taken as established for the purposes of the action; (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence; (iii) striking pleadings in whole or in part; (iv) staying further proceedings until the order is obeyed; (v) dismissing the action in whole or in part; and (vi) rendering a default judgment against the disobedient party.

The Fourth Circuit has developed a four-part test for use in determining what sanctions to impose under Rule 37. Wilson v. Volkswagen of Am., Inc., 561 F.2d 494, 503-06 (4th Cir. 1977), cert. denied, 434 U.S. 1020 (1978). The court must determine (1) whether the non-complying party acted in bad faith; (2) the amount of prejudice that noncompliance caused the adversary; (3) the need for deterrence of the particular sort of non-compliance; and (4) whether less drastic sanctions would be effective. Id.

**III**

Given the nature and extent of the discovery difficulties in this case, the court finds it difficult to believe that the multitude of problems experienced are all happenstance. In state court alone, plaintiff filed five motions to compel in 2008. Counsel for plaintiff was required to

go to great lengths to obtain discovery, including having to schedule additional hearings to present orders from earlier hearings when CPMC's counsel refused to agree to the language proposed. State court records appear to indicate that defendants' objections consistently were overruled by the Roanoke County Circuit Court. The federal court difficulties recounted above include failure to produce documents and identify witnesses, and use of questionable investigatory tactics. Even after years of discovery and numerous hearings, certain relevant documents were not produced to plaintiff until the court took the extraordinary step of requiring counsel to certify that all responsive documents had been produced. Independent witnesses, not associated with either party, expressed concern about the investigation authorized by counsel for CPMC. Given these myriad problems, the court cannot ascribe good faith to all of CPMC's actions in the discovery process.

Second, Dr. Baylor certainly has been prejudiced to some extent by the delay in identification of Frank Dieter and Mary Innes as well as the delay in production of the CPMC documents in Dieter's possession, including the "Gayle's folder" billing procedure memoranda and documents produced pursuant to the January 4, 2011 certification order. Critical depositions, including that of former practice administrator Kay O'Connell, have been taken without the benefit of these documents. Given that O'Connell is reported to reside in Texas, or elsewhere out of the district and beyond the subpoena power of the court, Dr. Baylor is prejudiced by not having the opportunity to examine her about these tardily produced materials.

Further, CPMC has been anything but forthcoming as regards its financial picture during the time Dr. Baylor worked there. On May 22, 2009, CPMC's counsel sent Dr. Baylor's counsel certain Lytec financial production reports concerning the period Dr. Baylor was employed by CPMC. Once Dr. Baylor had his expert prepare a report based on this data and sought to confirm it through requests for admissions, CPMC recanted and announced that the May 2009

Report was flawed. CPMC proffers alternative data and seeks to keep Dr. Baylor's experts from testifying, arguing that their opinions are too speculative.

It is clear to the court that the cost of this lawsuit has been enormously exaggerated by CPMC's actions. This case should be very straightforward; it should not have been this difficult or costly for Dr. Baylor to get a clear financial picture of CPMC during the relatively short period he worked there. But the discovery of this financial data has been thwarted at every turn and has been anything but simple. The Federal Rules contemplate orderly discovery and timely and complete production of documents. In contrast to what the rules require, CPMC's discovery in this case can best be described as haphazard.

Counsel and parties to litigation should not benefit from such conduct, and deterrence is essential to prevent parties in the future from stonewalling their opponents and preventing them from learning the true facts of the case. This lawsuit should have been easily prepared and tried. Instead, it has been clouded by allegations of hiding witnesses, hiding documents, manipulating data and intimidating witnesses. Such conduct has no place in litigation, and can only serve to drive up the cost to the parties, increase the burden to the court and undermine confidence in our justice system.

Given the widespread nature of the discovery problems, the court must first consider whether justice requires that a default judgment be imposed for plaintiff, or whether some less drastic sanction should be imposed. In his sanctions motion, Dr. Baylor seeks entry of default judgment for the breach of contract claim in an amount consistent with the figures in the May 2009 Report produced by CPMC, plus attorney's fees and costs for defendants' discovery failings. In support of his motion, Dr. Baylor emphasizes that the information necessary for the proper calculation of his production bonus has always been in the exclusive control of CPMC

and the Samarasinghes, and they have gone to great lengths to frustrate his ability to discover the true nature of his damages.

A default judgment is appropriate as a sanction in only the most flagrant of circumstances, typically involving callous disregard of court orders. Mutual Fed. Sav. & Loan Ass'n v. Richards & Assoc., 872 F.2d 88, 92-93 (4th Cir. 1989). As difficult as the discovery has been in this case, Dr. Baylor has identified no violations of orders. As a result, less drastic, yet still effective, sanctions are called for in this case. Hathcock v. Navistar Int'l Transp. Corp., 53 F.3d 36, 40-41 (4th Cir. 1995). Because of the substantial difficulties experienced by plaintiff in ascertaining a correct assessment of CPMC's financial situation, the court will allow Dr. Baylor's experts to testify. The court does not believe it appropriate to enter an evidentiary sanction pegging the damages in this case at the levels reflected in the May 2009 Report, as the report on its face appears incredible. Nor does the court believe it appropriate to award additional monetary sanctions based on CPMC's production of that apparently erroneous report for two reasons. First, given how damaging the report is to CPMC's interests, it is difficult to see how this report could reflect deliberate deception or bad faith. Second, the problems associated with the May 2009 Report have already been remedied by the state court order allowing Dr. Baylor's experts unfettered access to the CPMC's Lytec database. Further, the court is mindful of the fact that CPMC has had to incur substantial legal fees of its own associated with the January 4, 2011 certification order.

## IV

Therefore, considering the legal standard and the course of this litigation, the court orders the imposition of the following sanctions:

(1) Plaintiff is permitted to take the deposition of Kay O'Connell and Linda Gayle Dillon at CPMC's and the Samarasinghes' expense. CPMC and the Samarasinghes shall pay

for the costs of the court reporter and transcript of the depositions, along with reasonable attorney's fees and expenses, including travel expenses, for Dr. Baylor's counsel to take these depositions.

(2) CPMC's private investigator will not be permitted to testify at the trial of this case, and shall have no further role in this case.

(3) CPMC and the Samarasinghes shall pay Dr. Baylor's reasonable attorney's fees and costs incurred as a result of the late identification of Frank Dieter and Mary Innes and the production of documents in Dieter's possession, including the July 14, 2009 letter and the Gayle's Folder documents. Such fees and costs include those associated with the various show cause and sanctions issues; those associated with discovery issues surrounding Frank Dieter and Mary Innes; and those associated with documents produced by Dieter pursuant to the subpoena issued to him and documents produced as a result of the January 4, 2011 certification order, including the 30(b)(6) deposition.

(4) CPMC and the Samarasinghes shall pay reasonable expert fees and costs incurred by Dr. Baylor as a result of his experts' consideration of the late production of the Dieter documents, including the July 14, 2009 memo and the Gayle's Folder documents, the documents produced following the court's January 4, 2011 certification order, including the Kay O'Donnell patient referral log, and information gleaned from the upcoming O'Donnell and Dillon depositions.

(5) The jury may be informed of the problems experienced by Dr. Baylor in getting accurate financial data from CPMC, including the disparity between the May and August, 2009 numbers. The jury may be informed of CPMC's failure to identify Frank Dieter and Mary Innes, and the failure to produce Dieter's July 14, 2009 letter,

> the Gayle's Folder documents, the Kay O'Connell patient referral log, and the June 28, 2006 North Carolina privileging letter.
>
> (6) The court overrules defendants' objections to Dr. Baylor's expert reports and testimony, and plaintiff's experts will be permitted to testify. It is simply absurd for CPMC and the Samarasinghes to have taken actions that have hampered and clouded reasonable efforts to discern the proper calculation of Dr. Baylor's claimed production bonus, and then claim that Dr. Baylor's experts, striving to make some sense out of the mess engendered by CPMC and the Samarasinghes' discovery failings, cannot testify because CPMC suggests data they rely upon is inherently unreliable. At its core, it is CPMC and the Samarasinghes' data, and the problem is of their own creation. They cannot use the problems they created as a basis for seeking to exclude Dr. Baylor's expert witnesses.[4]
>
> (7) No sanctions are awarded against Dr. Kelly.

Dr. Baylor is **DIRECTED** to file a statement of fees, costs and other expenses concerning these categories of sanctions ordered within fourteen (14) days of the date of this Order.[5] CPMC and the Samarasinghes may file any opposition to the claimed fees and expenses within fourteen (14) days of the date plaintiff's statement is filed with the court. Defendants will be given an opportunity to be heard on their objections before specific monetary sanctions are imposed.

---

[4] However, as noted in the accompanying summary judgment opinion, because even Dr. Baylor's expert believes that the May 2009 Report is erroneous, a damages calculation based on that report will not be permitted.

[5] For those expenses that have not yet been incurred, plaintiff may file a supplemental statement of fees and costs within 14 days of the date such fees are incurred.

It is so **ORDERED**.

Entered: April 6, 2011

*/s/ Michael F. Urbanski*

Michael F. Urbanski
United States Magistrate Judge