**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| **GEORGE MONTGOMERY BAYLOR, M.D.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 7:09cv00472** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **COMPREHENSIVE PAIN MANAGEMENT** | ) | **By: Hon. Michael F. Urbanski** |
| **CENTERS, INC., et al.,** | ) | **United States Magistrate Judge** |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on defendants' motions for summary judgment (Docket Nos. 98, 101 and 103). The issues have been exhaustively briefed and were argued at a hearing on February 28, 2011. For the reasons set forth below, the motions are **GRANTED in part** and **DENIED in part**.

## I.  <u>BACKGROUND</u>

This lawsuit arises out of the employment and termination of Dr. George Montgomery Baylor as a pain management physician with Comprehensive Pain Management Centers, Inc. ("CPMC"). Dr. Baylor contends that CPMC breached his Employment Agreement by not paying him an appropriate production bonus. Dr. Baylor also claims that Dr. Gunasiri Samarasinghe, CPMC's owner, and his wife Kathleen Samarasinghe, CPMC's business manager, along with Dr. Michael T. Kelly, another doctor working at CPMC, engaged in a variety of business torts, including statutory conspiracy, defamation and tortious interference, associated with Dr. Baylor's termination. Further, Dr. Baylor alleges that CPMC terminated him in violation of the Uniformed Services Employment and Reemployment Rights Act

("USERRA"), 38 U.S.C. § 4301 et seq., a federal statute designed to preserve the jobs of persons called to military service.

Dr. Baylor signed an Employment Agreement with CPMC on April 4, 2004. Section 3 of that Agreement concerns his compensation, and provides that in addition to his annual salary of $230,000, Dr. Baylor "shall receive production bonuses so that his compensation package including salary, benefits and bonuses shall equal 50% of the total receipts generated by the Employee for each twelve-month period beginning on the date of initial employment." CPMC's Summ. J. Br. (Dkt. #102), at Ex. 1. An Amendment to Employment Agreement was executed on May 10, 2005, making two principal changes. Dr. Baylor's salary was increased to $300,000 effective January 1, 2005, and the term of the Employment Agreement was extended to December 31, 2005.

Dr. Baylor was a U.S. Army reservist and was notified in late November, 2005 that he was being called to active duty. Dr. Baylor reported for active duty on January 2, 2006, a few days after his Employment Agreement with CPMC ended. Nonetheless, CPMC held Dr. Baylor's position open for him, and he returned to work at CPMC on April 10, 2006. In the interim, CPMC hired Dr. Kelly to assist in Dr. Baylor's absence.

The parties disagree as to what happened when Dr. Baylor returned to work. Dr. Baylor asserts that he "received a frosty reception upon his return to CPMC." Pl.'s Br. in Opp. to Summ. J. (Dkt. #116), at 13. Dr. Kelly continued to see patients, and "there was a perceptible shift in the demeanor of staff toward Dr. Baylor." Id. at 14. In contrast, defendants assert that on the day Dr. Baylor returned to work, he brought with him a letter from his lawyer setting forth certain allegations and demands. In its brief, CPMC states that "[t]he receipt of the letter from Baylor's attorney on the day of his return to work at CPMC caused both of the Samarasinghes to

reconsider Baylor's desire to resume working at CPMC on a long term basis." CPMC's Summ. J. Br. (Dkt. #102), at 9. CPMC and the Samarasinghes also assert that once Dr. Baylor returned, "there were several incidents that occurred involving Baylor that disrupted the CPMC office and caused the Samarasinghes concern." Id.

Matters came to a head on May 1, 2006. Dr. Samarasinghe asked Dr. Baylor to speak with him in a conference room, and an argument ensued. Words were exchanged, including an expletive Dr. Baylor directed at Dr. Samarasinghe. Dr. Samarasinghe then fired Dr. Baylor.

After Dr. Baylor's termination, CPMC asserts that "[t]he Samarasinghes instructed CPMC employees and staff to advise patients who called for an appointment with Baylor . . . that Baylor was no longer with the practice, that the patient could schedule with another physician at CPMC or advise CPMC where he or she wanted to be referred out to." CPMC's Summ. J. Br. (Dkt. #102), at 11. Dr. Baylor paints quite a different picture, contending that "CPMC persisted in giving Dr. Baylor's patients misinformation or no information about his whereabouts." Pl.'s Br. in Opp. to Summ. J. (Dkt. #116), at 16. Dr. Baylor asserts that patients asking about him were told a number of derogatory things, including that he was fired for "ethical reasons," that he had low integrity, and had broken his contract by going on military leave. Id.

Dr. Baylor filed suit in state court in 2007 and was subsequently granted leave to amend his complaint. In 2009, he filed his amended complaint, which included a USERRA claim, a violation of federal law. This prompted defendants to remove this action to federal court in November, 2009. The parties consented to the undersigned's jurisdiction over this case and pursuant to 28 U.S.C. § 636(c), the case was transferred to the undersigned by Order dated December 9, 2009.

Dr. Baylor contends in Counts I and II of his complaint that CPMC breached his Employment Agreement by not paying him a production bonus.[1] In this regard, Dr. Baylor's principal contentions are that he should have received production credit for receipts associated with billings for physician assistants under his supervision, receipts associated with medications he administered, and receipts incorrectly allocated to Dr. Samarasinghe. Dr. Baylor also contends that CPMC failed to collect his billings in an appropriate manner, resulting in fewer receipts attributed to him. In all, Dr. Baylor claims that he was shorted on the production bonus by a number ranging from $443,664 to $3.2 million.[2] In addition, Dr. Baylor contends that CPMC did not pay for certain benefits to which he was entitled, including disability insurance, dental coverage and participation in a 401K plan, resulting in damages of approximately $13,684.

Counts III and IV allege that defendants defamed Dr. Baylor by making a host of derogatory statements to patients after his termination, such as telling his patients that he had left, that his whereabouts were unknown, that he was let go for ethical reasons and that his integrity was not high.[3] Dr. Baylor contends that a reasonable inference from these statements is that Dr. Baylor abandoned his patients and is unfit to practice medicine, constituting defamation per se.

In Count V, Dr. Baylor claims that defendants engaged in a conspiracy in violation of Virginia Code §§ 18.2-499 and 500. Relying principally on the foregoing facts, Dr. Baylor

---

[1] Count II, seeking an accounting of receipts against CPMC, is derivative of CPMC's obligations under the contract and is subsumed therein.

[2] CPMC asserts that Dr. Baylor's expert evidence should be excluded for failure to comply with Federal Rule of Civil Procedure 26(a)(2)(B) and under Federal Rule of Evidence 702. CPMC's Summ. J. Br. (Dkt. # 102), at 23-31. This issue is addressed infra, in § III.A.

[3] Count III seeks an injunction against any such disparaging statements.

contends that Dr. Kelly conspired with CPMC and the Samarasinghes to replace him at CPMC, resulting in injury to his profession and reputation.

Dr. Baylor alleges in Count VI that defendants tortiously interfered with his Employment Agreement with CPMC and with his prospective business relationships with his patients. Dr. Baylor asserts that:

> Defendants used fraud, deceit and defamation in interfering with [his] contract with CPMC, falsely accusing him of unethical conduct and other workplace misconduct. In the process, Defendants also violated USERRA–dismissing him, without reasonable cause, and discriminating against him for both his military service and his assertion of rights under USERRA. This constellation of wrongful acts constitutes 'improper methods' under any reading of Virginia's tortious-interference law.

Pl.'s Br. in Opp. to Summ. J. (Dkt. #116), at 48.

Finally, in Count VII, Dr. Baylor claims that his termination by CPMC violated the protections afforded him under USERRA, as he was terminated without cause within 180 days of his return to CPMC and discriminated against based on his military service and his assertion of rights under USERRA.

Defendants argue all of these claims fail as a matter of law and should be dismissed.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, if the evidence "is merely colorable or is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted). "As to

materiality. . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248.

Once a motion for summary judgment is properly made and supported, the nonmoving party may not rely merely on allegations or denials in its own pleading; rather, it must set out specific facts showing that there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Anderson, 477 U.S. at 250. In deciding the motion, the court must view the record as a whole and draw reasonable inferences in the light most favorable to the nonmoving party. In re Apex Express Corp., 190 F.3d 624, 633 (4th Cir. 1999). A judge's function at the summary judgment stage is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

## III. DISCUSSION

### A. Counts I & II: Breach of Contract

CPMC asserts that it is entitled to summary judgment on the breach of contract claim because there is no evidence that CPMC breached the Employment Agreement or that Dr. Baylor suffered any damages. Dr. Baylor claims that CPMC breached the Employment Agreement by not paying him a production bonus and by not providing him with certain benefits.

#### 1. Production bonus claim

As regards the production bonus claim, Dr. Baylor argues that CPMC breached the agreement by failing to undertake reasonable efforts to collect his billings and to accurately report the receipts resulting from his treatment of patients. He contends that CPMC's billing and collection practices failed to meet industry standards. Dr. Baylor further argues that CPMC's failure to accurately report and collect his billings breaches paragraph 6 of the Employment Agreement, which provides that "[t]he Employee shall be furnished with a private office,

stenographic help and other facilities and services, suitable to his position and necessary for the performance of his duties." CPMC's Summ. J. Br. (Dkt. #102), at Ex. 1. The second aspect of the production bonus issue is Dr. Baylor's contention that CPMC breached the Employment Agreement by failing to give Dr. Baylor credit for collections from billings made under his provider numbers for supervising Physician Assistant ("PA") services and supplies.

The Employment Agreement provides that the production bonus is calculated based on "total receipts generated by the Employee," but it is silent on what this term means. Id. at 1. It does not state whether Dr. Baylor's total receipts include billings attributable to patient services provided by him alone or whether they also include billings by PAs he supervises or medicines and supplies he provides to patients. Nor does the Employment Agreement say anything about collection practices, much less industry standards.

CPMC argues from black letter law that the contract is unambiguous and that the court should look no further than its four corners to determine its meaning. Certainly, if the contract was unambiguous, no jury issue would be raised. But that is not the case here. The Employment Agreement does not spell out with any specificity what is included in "total receipts generated by the Employee," and the meaning of that critical term cannot be determined just by looking at the text of the Agreement alone. Additional evidence is required on the issue of what "total receipts generated by the Employee" means. On the one hand, Dr. Baylor credibly argues that these receipts would not have been generated absent his provision of the medicines and supplies and supervision of the PAs. On the other hand, there is no suggestion that Dr. Baylor, as opposed to CPMC, paid for the medicines and supplies or contributed to the salary of the PAs he supervised, raising a legitimate question as to whether he should be entitled to a production bonus for materials supplied by CPMC and services rendered by its other employees. With respect to the

collections issue, the Employment Agreement is ambiguous on that point as well. As factual issues abound on the interpretation of the contract, CPMC's motion for summary judgment on the production bonus contract claim must be denied.

CPMC also argues summary judgment should be granted in its favor on this issue because Dr. Baylor has not provided admissible evidence proving he is owed damages under the contract. Specifically, CPMC contends that the testimony of Dr. Baylor's damages expert, Michael Stearns, is inadmissible for failure to prepare an expert report under Federal Rule of Civil Procedure 26(a)(2)(B), and that testimony from both Stearns and Neal Lawson, Dr. Baylor's expert on the reliability of CPMC's billing database, are inadmissible under Federal Rule of Evidence 702. As set forth in greater detail in the accompanying sanctions opinion, CPMC is in no position to complain about Dr. Baylor's discovery responses. The court has reviewed all of the expert reports in this case and read all of the expert witness depositions. Certainly, CPMC has had an opportunity to fully explore at deposition all of Stearns and Lawson's opinions. To the extent that the interrogatory answer identifying Stearns and his opinion does not fully meet the letter of Rule 26(a)(2)(B), the court finds any deficiencies to be substantially justified by the myriad problems experienced by Dr. Baylor in seeking to obtain an accurate financial picture of CPMC during the years he worked there. Moreover, as CPMC deposed Stearns for many hours and explained his opinions and the basis therefor, any Rule 26(a)(2)(B) deficiency is harmless. <u>See</u> Fed. R. Civ. P. 37(c)(1) (stating that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").

CPMC also argues that Stearns' opinion be stricken under Federal Rule of Evidence 702 because he is not qualified to evaluate data from CPMC's Lytec database, his opinion relies on unreliable data, and his opinion reflects a misunderstanding as to what should be included in Dr. Baylor's production bonus under the Employment Agreement.

Review of Stearns' deposition does not support CPMC's argument that he is unqualified. Stearns is an accountant and principal in Comprehensive Medical Management, a firm providing management and billing services to medical practices, including a sizeable number of anesthesia and pain management practices. Previously, Stearns had been employed as the chief financial officer of a large anesthesia and pain management practice in Cincinnati. Nor does the court believe that prior experience with the particular software system used by CPMC, Lytec, to be a prerequisite to rendering an expert opinion on damages in this case. Indeed, CPMC's damages expert, Linda M. Van Horn, indicated that she and her firm "are not knowledgeable on Lytec." Van Horn Dep. at 50.

In one respect, however, CPMC's motion is well taken. Stearns calculates two damages models, one based on a May 2009 Practice Analysis – Charges Report ("May 2009 Report"), and one based on an August 2009 Practice Analysis – Charges Report ("August 2009 Report"). Both the May 2009 Report and the August 2009 Report purport to cover the period Dr. Baylor worked at CPMC in 2004 and 2005. Based on these reports, Stearns calculated alternative damages models, which were attached to a second supplement interrogatory response served in November, 2010. See Stearns Dep. Ex. 16. With the exception of five months, the figures contained in the two reports for "Monthly Receipts" are generally the same during the period Dr. Baylor worked at CPMC in 2004 and 2005. For these five months, however, the monthly receipt

numbers for the practice diverge wildly between the May 2009 Report and the August 2009

Report. The salient differences, as set out in Stearns' spreadsheets, are as follows.

|        | May 2009 Report | August 2009 Report |
|--------|-----------------|--------------------|
| Nov 04 | $961,268        | $58,064            |
| Feb 05 | $880,720        | $52,749            |
| Apr 05 | $530,241        | $19,664            |
| Sep 05 | $550,576        | $41,379            |
| Nov 05 | $488,810        | $75,874            |

The huge numbers in the May 2009 Report also vary markedly from the other months in the

reports. In contrast to these five large outliers, the other monthly receipt numbers for 2004 and

2005 are consistent with one another. Of note, none of the monthly receipt numbers for the other

months in 2004 and 2005 exceed $100,000, much less approach the half million dollar mark.

Dr. Baylor's own expert appears to recognize that the numbers in the May 2009 Report

are unreliable. In his deposition, Stearns acknowledged that the largest entry in the May 2009

Report was erroneous. When questioned about the over $950,000 monthly receipt figure for the

November, 2004 period, Stearns testified as follows:

> Q.   Do you believe that there is a mistake in that report, in your
>      professional opinion?
>
> A.   Yes.

Stearns Dep. at 193.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993), the Supreme

Court held that Federal Rule of Evidence 702 imposes an obligation upon a trial judge to "ensure

that any and all scientific testimony or evidence admitted is not only relevant, but reliable."

Given Stearns' statement that at least one sizeable entry in the May 2009 report is mistaken, this

report cannot form the basis of a reliable damages calculation under Daubert. As such, Stearns

may not base a damages opinion on the May 2009 Report. However, Stearns may testify as to any damages opinion based on the August 2009 Report.

As regards Lawson, the court finds CPMC's argument that his testimony is inadmissible under Rule 702 to be unavailing. Lawson will be permitted to testify.

### 2. Benefits claim

With respect to the benefits claim, Dr. Baylor contends that the Employment Agreement obligates CPMC to provide long term disability insurance, dental coverage and access to the firm's 401K plan, and CPMC did not. CPMC argues that Dr. Baylor was not entitled to such benefits because the Employment Agreement states that the provision of such benefits are "subject to the eligibility requirements applying to similarly-situated employees." CPMC's Summ. J. Br. (Dkt. #102), at Ex. 1. There is also an issue as to whether Dr. Baylor was damaged by any of these alleged breaches. Because genuine issues of material fact exist, this claim, too, must go to trial.

### B. Counts III & IV: Defamation

Counts III and IV claim that Dr. Kelly, and the CPMC office staff, acting at the direction of the Samarasinghes, defamed Dr. Baylor by stating that his integrity was not high, that he was let go for ethical reasons and by implying that he had abandoned his patients. See Pl.'s Br. in Opp. to Summ. J. (Dkt. #116), at Ex. 22. Dr. Baylor argues that such statements are defamatory per se.[4]

---

[4] Dr. Baylor alleges a litany of other statements made by defendants after he left CPMC, including statements to the effect that he was "rude to the staff," is an "a**hole," patients didn't like him, and "be glad you that you didn't have to work with Dr. Baylor." See Samarasinghes' Summ. J. Br. (Dkt. # 104), at Ex. K. Many of these statements do not rise to the level of actionable defamation under Virginia law, even assuming the statements were false as Dr. Baylor asserts. Criticism of plaintiff's job performance or manner, even if clearly damaging to Dr. Baylor's interests, does not necessarily constitute actionable defamation. Instead, the actionable statements must be measured against the Virginia common law standards for defamation that require a statement either fit within a specific category of defamation per se or be sufficiently severe to meet the general defamation standard. Etchenkamp v. Loundon Cty. Pub. Sch., 263 F. Supp. 2d 1043, 1063 (E.D. Va. 2003). On brief, Dr. Baylor concedes that many of these

Under Virginia common law, "a private individual asserting a claim of defamation first must show that a defendant has published a false factual statement that concerns and harms the plaintiff or the plaintiff's reputation." Hyland v. Raytheon Tech. Servs. Co., 277 Va. 40, 46, 670 S.E.2d 746, 750 (2009) (citing WJLA-TV v. Levin, 264 Va. 140, 152-54, 564 S.E.2d 383, 390-91 (2002); The Gazette, Inc. v. Harris, 229 Va. 1, 15, 37, 325 S.E.2d 713, 725, 738 (1985)). The plaintiff must prove by a preponderance of the evidence that the statement was false or, believing it to be true, lacked a reasonable basis for such belief, or acted negligently in failing to ascertain the facts on which the statement was based.[5] Id.; The Gazette, Inc., 229 Va. at 15, 325 S.E.2d at 725.

To be actionable, "the statement must be not only false, but also defamatory, that is, it must 'tend[] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1092 (4th Cir. 1993) (quoting Restatement (Second) of Torts § 559). "Merely offensive or unpleasant statements are not defamatory." Id. Rather, defamatory statements "are those that 'make the plaintiff appear odious, infamous, or ridiculous.'" Id. (quoting Echtenkamp v. Loudon Cty. Pub. Sch., 263 F. Supp. 2d 1043, 1061 (E.D. Va. 2003)). To be actionable as defamation, a statement must contain a defamatory "sting." "The falsity of a statement and the defamatory 'sting' of the publication must coincide – that is, where the alleged

---

statements, while scurrilous and distasteful, are not sufficiently objective to constitute defamation. Pl.'s Br. in Opp. to Summ. J. (Dkt. #116), at 32, n. 20. Thus, while Dr. Baylor alleges many unsavory things have been said about him by defendants, his defamation case boils down to whether statements that imply Dr. Baylor abandoned his patients and that his integrity was not high and that he was let go for ethical reasons are actionable.

[5] The negligence standard is limited to situations in which the defamatory statement makes substantial danger to the plaintiff's reputation apparent. The Gazette, Inc., 229 Va. at 15, 325 S.E.2d at 725; see also Hyland, 277 Va. at 46, 670 S.E.2d at 750.

defamatory 'sting' arises from substantially true facts, the plaintiff may not rely on minor or irrelevant inaccuracies to state a claim for libel." Chapin, 993 F.2d at 1092.

A defamatory statement may be made "by inference, implication or insinuation." Carwile v. Richmond Newspapers, 196 Va. 1, 7, 82 S.E.2d 588, 592 (1959). At the same time, "[w]hile 'every fair inference' in a pleading may be used to determine whether the words complained of are capable of a meaning ascribed by innuendo, inferences cannot extend the statements, by innuendo, beyond what would be the ordinary and common acceptance of the statement." Yeagle v. Collegiate Times, 255 Va. 293, 297, 497 S.E.2d 136, 138 (1998). "[I]nnuendo cannot be employed to 'introduce new matter, nor extend the meaning of the words used, or make that certain which is in fact uncertain.'" Perk v. Vector Res. Group, Ltd., 253 Va. 310, 316, 485 S.E.2d 140, 144 (1997) (quoting Carwile, 196 Va. at 8, 82 S.E.2d at 592). Indeed, "because the Constitution provides a sanctuary for truth, a libel-by-implication plaintiff must make an especially rigorous showing where the expressed facts are literally true. The language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference." Chapin, 993 F.2d at 1092-93. In addition, a plaintiff cannot combine the damaging nature of certain true statements with the falsity of other, immaterial statements in order to provide the basis for a defamation claim. AIDS Counseling & Testing Ctrs. v. Group W Television, Inc., 903 F.2d 1000, 1004 (4th Cir. 1990).

Defamatory words that "prejudice [a] person in his or her profession or trade," for example by imputing an unfitness to perform job duties or a lack of integrity in the performance of duties, are actionable as defamation per se. Fuste v. Riverside Healthcare Ass'n, Inc., 265 Va. 127, 132, 575 S.E.2d 858, 861 (2003) (quoting Carwile, 196 Va. at 7, 82 S.E.2d at 591); Hyland,

277 Va. at 46, 670 S.E.2d at 750; <u>Yeagle</u>, 255 Va. at 297 n.2, 497 S.E.2d at 138.  A person

maligned by defamation <u>per se</u> may recover compensatory damages for injury to reputation,

humiliation and embarrassment without demonstrating any financial loss.[6]  <u>Great Coastal</u>

<u>Express, Inc. v. Ellington</u>, 230 Va. 142, 151, 334 S.E.2d 846, 852 (1985).  To be actionable

without proof of special damages, the words used must contain an imputation that is "necessarily

hurtful" in its effect upon plaintiff's business and must affect him in his particular trade or

occupation.  <u>Fleming v. Moore</u>, 221 Va. 884, 889-90, 275 S.E.2d 632, 636 (1981); <u>James v.</u>

<u>Haymes</u>, 160 Va. 253, 261-62, 168 S.E. 333, 336 (1933).  "There must be a nexus between the

content of the defamatory statement and the skills or character required to carry out the particular

occupation of the plaintiff."  <u>Fleming</u>, 221 Va. at 890, 275 S.E.2d at 636.

Causes of action for defamation, while rooted in state common law, are subject to

principles of freedom of speech arising under the First Amendment to the United States

Constitution.  The United States Supreme Court has identified constitutional limits on the type of

speech that may be the subject of common law defamation actions.  Speech which does not

contain a provably false factual connotation, or a statement which cannot reasonably be

interpreted as stating actual facts about a person, cannot form the basis for a common law

defamation action.  <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1, 16-17 (1990); <u>see also</u> <u>Fuste</u>,

265 Va. at 132, 575 S.E.2d at 861.  Expressions of opinion, which are relative in nature and

depend largely upon the speaker's viewpoint, are constitutionally protected and are not

actionable as defamation.  <u>Hyland</u>, 277 Va. at 46, 670 S.E.2d at 750; <u>Fuste</u>, 265 Va. at 132-33,

575 S.E.2d at 861; <u>see also</u> <u>Potomac Valve & Fitting, Inc. v. Crawford Fitting Co.</u>, 829 F.2d

---

[6] "A private plaintiff must still prove negligence as a predicate for recovery, even if the words published are actionable <u>per se</u>.  A plaintiff who proves the publication of words actionable <u>per se</u> is simply relieved of the necessity of proving the quantum of his damages for injury to reputation, humiliation, and embarrassment."  <u>Great Coastal</u>, 230 Va. at 152, 334 S.E.2d at 853.

1280, 1285 (4th Cir. 1987). If a statement cannot be objectively characterized as true or false, then it is not actionable. Blue Ridge Bank v. Veribanc, Inc., 866 F.2d 681, 685 (4th Cir. 1989).

The question of whether a defamatory statement is one of fact or opinion presents a legal question to be decided by the trial judge. Hyland, 277 Va. at 48, 670 S.E.2d at 751; Chapin, 993 F.2d at 1092; Fuste, 265 Va. at 132-33, 575 S.E.2d at 861; Chaves v. Johnson, 230 Va. 112, 119, 335 S.E.2d 97, 102 (1985). The Fourth Circuit has outlined a "thoughtfully elaborated list" of factors to be considered in drawing the line between fact and opinion:

> To identify an opinion, a trial judge should (1) consider the author or speaker's choice of words; (2) decide whether the challenged statement is "capable of being objectively characterized as true or false;" (3) examine the context of the challenged statement within the writing or speech as a whole; and (4) consider "the broader social context into which the statement fits."

Potomac Valve, 829 F.2d at 1287-88 (following Ollman v. Evans, 750 F.2d 970, 981-84 (D.C. Cir. 1984)). In considering whether a statement is one of fact or opinion, a court must consider the statement as a whole; it may not isolate parts of an alleged defamatory statement from another portion of the statement. Hyland, 277 Va. at 48, 670 S.E.2d at 751; Am. Commc'ns Network, Inc. v. Williams, 264 Va. 336, 341-42, 568 S.E.2d 683, 686 (2002). "[O]nce a trial judge has determined that an allegedly defamatory statement is capable of being proved false, the jury's function is to evaluate the evidence presented and to determine whether the plaintiff has met her burden of proving that the allegedly defamatory statement is false." Hyland, 277 Va. at 48, 670 S.E.2d at 751.

### 1. CPMC's liability

CPMC argues that there is no basis upon which to assert a defamation claim against it, contending that "[t]here is no evidence or suggestion that CPMC issued any sort of corporate statement that addresses Baylor, much less a corporate statement that was defamatory." CPMC

Summ. J. Br. (Dkt. #102), at 33. Thus, CPMC argues, the corporation has no liability for defamation. It is difficult to square this assertion with the statement earlier in the same brief that "[t]he Samarasinghes instructed CPMC employees and staff to advise patients who called for an appointment with Baylor to advise patients that Baylor was no longer with the practice," CPMC Summ. J. Br. (Dkt. #102), at 11, and the undisputed evidence that Mrs. Samarsinghe instructed CPMC's employees to tell patients when they inquired about Dr. Baylor that he was no longer associated with CPMC and that they did not know where he was. Kathleen Samarasinghe Dep., Vol. 2, at 9. Certainly, CPMC is responsible for defamatory statements made by its employees acting within the scope of their employment, see Sun Life Assur. Co. v. Bailey, 101 Va. 443, 447, 44 S.E. 692, 693 (1903), just as Dr. and Mrs. Samarasinghe are responsible for defamatory statements made by them and republished by others "acting at their direction." Fuste, 265 Va. at 134, 575 S.E.2d at 862.

### 2. Exact words standard

Defendants argue that Dr. Baylor's allegations lack specificity as to what was said by whom to whom, and thus do not meet the "exact words" standard set forth in Federal Land Bank of Baltimore v. Birchfield, 173 Va. 200, 215, 3 S.E.2d 405, 410 (1939). Birchfield requires that a pleading alleging slander set out the exact words spoken. "Words equivalent or of similar import are not sufficient." Id. Beyond that, defendants assert that Birchfield requires Dr. Baylor to prove "the specific day or occasions on which the statements were made, . . . the names of agents or representatives of defendant corporation who made the statements, . . . [and] the names of the persons to whom they were made." Id. at 216-17, 3 S.E.2d at 411.

In support of his defamation claim, Dr. Baylor points to deposition excerpts from CPMC staff members who testified as to what was said to patients about Dr. Baylor's absence and how

patients reacted to the news. He also provides affidavits from three former patients: (a) Rodney Phillips; (b) Ken Taylor; and (c) Kathy Clyde.[7] Rodney Phillips averred that when he asked for Dr. Baylor, he was told by Dr. Samarasinghe's PA, Arun Sun, that Dr. Baylor had moved to West Virginia to take care of his sick mother and would "never be back." When asked for Dr. Baylor's contact information, Sun told Phillips that they did not know how to get in touch with Dr. Baylor. Pl.'s Br. in Opp. to Summ. J. (Dkt. #116), at Ex. 21 ¶ 5. Ken Taylor stated as follows: "Dr. Kelly and the ladies who worked at the front desk told me Dr. Baylor wasn't coming back to CPMC. They also stated that Dr. Baylor's integrity was not high and that he was let go for 'ethical reasons.' They also said that Dr. Baylor broke his contract with CPMC by going on military leave." Pl.'s Br. in Opp. to Summ. J. (Dkt. #116), at Ex. 22 ¶ 5. Kathy Clyde averred that "[w]hen I asked the nurses at the front desk where Dr. Baylor had gone to, they said they had been told they couldn't tell any of the patients where Dr. Baylor went." Pl.'s Br. in Opp. to Summ. J. (Dkt. # 116), at Ex. 23 ¶ 7. None of these affiants have been deposed.

At this stage, the court finds that the affidavits provided by Dr. Baylor set forth with sufficient specificity the allegations of defamation. Whether the proof at trial is sufficient to support a finding of defamation will depend upon the actual testimony adduced at trial.

### 3. Actionable defamation

Defendants further argue that the alleged statements are not actionable defamation, as they constitute protected expressions of opinion, do not contain the necessary defamatory "sting," and do not amount to defamation per se.

---

[7] Dr. Baylor filed a fourth affidavit from former CPMC patient James Azim nearly a month after the hearing on the motions for summary judgment. (Dkt. #128.) Defendants CPMC and the Samarasinghes objected to the court's consideration of the affidavit. Because the three affidavits included in plaintiff's brief in opposition to summary judgment provide a sufficient basis for the court to rule on the issues before it, the affidavit of James Azim will not be considered.

According to plaintiff, defendants repeatedly told patients inquiring about Dr. Baylor that he was gone, was not coming back and they did not know how to reach him. Dr. Baylor argues that under these circumstances, the inference could be made that Dr. Baylor had abandoned his patients, a statement the Virginia Supreme Court found actionable in Fuste. 265 Va. at 133, 575 S.E.2d at 862. In Fuste, two pediatricians left a group practice where they had been employed for a number of years. As here, the departing doctors in Fuste claimed that their prior practice defamed them, by making statements that they were "unprofessional," "uncooperative," that there were "concerns about their competence," and that they had "abandoned their patients." Id. at 130, 575 S.E.2d at 860. The doctors claimed that their patients also were told that they "left suddenly," "were not able to work in the area," and "their whereabouts were unknown." Id. at 131, 575 S.E.2d at 860. The Circuit Court for the City of Newport News sustained a demurrer to the defamation claim, and the Virginia Supreme Court reversed. The Supreme Court determined that only two of the statements were actionable: that the doctors had "abandoned their patients" and that there were "concerns about their competence." Id. at 133, 575 S.E.2d at 862. The court held that these statements prejudiced the doctors in the practice of their profession and also contained a provably false factual connotation. Id. at 133, 575 S.E.2d at 861-62. As to the remaining statements, the court held that they "are either dependent on the speaker's viewpoint and are, therefore, expressions of opinion, do not prejudice the doctors in their professions, or, taken 'in their plain and natural meaning,' are not defamatory." Id. at 133, 575 S.E.2d at 862 (citing Chaves, 230 Va. at 119, 335 S.E. 2d at 101, and quoting Carwile, 196 Va. at 7, 82 S.E.2d at 591).

Dr. Baylor argues that abandonment can be inferred from the statements made to patients that Dr. Baylor would "never be back" and that nurses were unable to tell patients where he had

gone.  But plaintiff ignores the fact that while the Virginia Supreme Court in <u>Fuste</u> found use of

the specific term "abandon" to be actionable because of the nature of a doctor's professional

relationship to a patient, it found statements very similar to those alleged here, such as the

doctors "left suddenly," and "their whereabouts were unknown," not to be actionable.  <u>Fuste</u>, 265

Va. at 130-31, 575 S.E.2d at 860.

Nevertheless, the Virginia Supreme Court has held that a defamatory statement may be

made by "inference, implication or insinuation."  <u>Carwile</u>, 196 Va. at 7, 82 S.E.2d at 592.  When

determining "whether the words and statements complained of in the instant case are reasonably

capable of the meaning ascribed to them by innuendo, every fair inference that may be drawn

from the pleadings must be resolved in plaintiff's favor."  <u>Id.</u> at 8, 82 S.E.2d at 592.  At this stage

of the proceedings, given the affidavits of Rodney Phillips, Ken Taylor, and Kathy Clyde, as

well as the deposition testimony from CPMC staff, the undersigned cannot find as a matter of

law that these statements are not defamatory.  The court needs to hear from these witnesses at

trial as to exactly what was said and in what context, in order to determine whether abandonment

can be inferred and if the statements are actionable.

Likewise, the court must hear testimony from former patient Ken Taylor to determine

whether the statements made to him that Dr. Baylor's integrity is not high and that he was fired

for ethical reasons are actionable as defamation.  Taken alone, the statement that Dr. Baylor's

integrity is not high arguably could be considered an expression of opinion[8] and thus would not

be actionable.  But Ken Taylor's affidavit does not provide any factual context for the statement,

---

[8]  While simply stating that someone does not have integrity is subjective and unable to be proved true or false,
factual statements that imply lack of integrity can be actionable as defamation.  <u>See, e.g.</u>, <u>Hyland</u>, 277 Va. at 47, 670
S.E.2d at 751 ("Factual statements made in support of an opinion, however, can form the basis for a defamation
action."); <u>Echtenkamp</u>, 263 F. Supp. 2d at 1064 (statements that plaintiff altered a permission form after being told
not to, failed to obtain parental permission before conducting an evaluation, and lied could be construed to imply
that she lacks integrity).

and a statement of opinion that lacks an accurate statement of facts on which it is based "may be understood to imply inaccurate allegations of fact that are defamatory."  Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems § 4:3.2 (4th ed. 2010).  Without more context, the court cannot determine whether the statement is actionable.

According to the affidavit, this statement was accompanied by a statement that Dr. Baylor was "let go for 'ethical reasons.'"  Defendants assert this, too, constitutes an opinion.  But whether someone was terminated for ethical reasons can be proved true or false.  Cf. Fuste, 265 Va. at 133, 575 S.E.2d at 861-62 (finding statements about physicians' competence contain a provably false factual connotation; "[f]or example, evidence could be presented to show whether there were, in fact, concerns about the plaintiffs' competence.").  The term "ethical reasons" used in this context suggests that Dr. Baylor was terminated for a violation of a code of medical ethics, something more serious than unprofessionalism.  Plainly, stating that Dr. Baylor's integrity was not high and that he was fired for ethical reasons, if proven, could prejudice him in the practice of his profession.  See Tronfield v. Nationwide Mut. Ins. Co., 272 Va. 709, 636 S.E. 2d 447 (2006) (statement that lawyer "just takes people's money" was actionable as defamatory per se); Echtenkamp, 263 F. Supp. 2d at 1064 (statement that school psychologist was abrasive, unprofessional and rude was actionable as defamatory per se); Carwile, 196 Va. at 8, 82 S.E.2d at 591 (statements which charge an attorney with unethical or unprofessional conduct and which tend to injure or disgrace him in his profession are actionable per se); cf. Chaves, 230 Va. at 118, 335 S.E.2d at 101 (statement that architect is inexperienced does not impute unfitness and is not defamatory).

Defendants can be held liable for defamation "when a negative characterization of a person is coupled with a clear but false implication that the author is privy to facts about the person that are unknown to the general reader." <u>See</u> Sack, <u>supra</u>, § 4:3.2. The test for determining whether facts that may be actionable defamation have been implied is "whether a reasonable listener would take [the speaker] to be basing his 'opinion' on knowledge of facts of the sort than can be evaluated in a defamation suit." <u>See</u> Sack, <u>supra</u>, § 4:3.2. If the statements about Dr. Baylor's integrity and termination for ethical reasons were made together,[9] a reasonable listener indeed could infer that Dr. Kelly and/or the CPMC staff member(s) who made the statements were privy to facts concerning Dr. Baylor's termination, unknown to the listener.

On this record, the court cannot conclude as a matter of law that the statements that Dr. Baylor's "integrity was not high" and he was let go for "ethical reasons" are not actionable defamation. The Ken Taylor affidavit is sparse, and he was not deposed. Whether these statements possess the necessary defamatory "sting" or whether they were mere expressions of opinion are issues that must be decided at trial on a more complete record.[10]

### 4. Qualified privilege

Finally, CPMC and the Samarasinghes argue that these statements were made in the employment context and are somehow privileged. "A communication, made in good faith, on a subject matter in which the person communicating has an interest, or owes a duty, legal, moral or social, is qualifiedly privileged if made to a person having a corresponding interest or duty."

---

[9] <u>See</u> <u>Hyland</u>, 277 Va. at 48, 670 S.E.2d at 751 (in establishing whether a statement is one of fact or opinion, a court must consider the statement as a whole; it may not isolate parts of an alleged defamatory statement from another portion of the statement).

[10] In evaluating claims of defamation, it is appropriate for the court to consider the type of language used, the meaning of the statement in context, whether the statement is verifiable, and the broader social circumstances in which the statement is made. <u>Potomac Valve</u>, 829 F.2d at 1287.

<u>Taylor v. Grace</u>, 166 Va. 138, 144, 184 S.E. 211, 213 (1936).  It is for the court, not the jury, to determine whether a privilege exists.  <u>Aylor v. Gibbs</u>, 143 Va. 644, 648, 129 S.E. 696, 697 (1925).  Any such privilege may be defeated if the plaintiff proves that the defamatory statement was made maliciously.  <u>Larimore v. Blaylock</u>, 259 Va. 568, 572, 528 S.E.2d 119, 121 (2000).

Qualified privilege has been recognized in a number of cases involving defamatory statements made between co-employees and employers in the course of employee discipline or discharge matters.  CPMC and the Samarasinghes argue for an extension of the qualified privilege beyond the employment relationship, suggesting that because Dr. Baylor was employed at CPMC, a qualified privilege extends to defamatory statements made to its patients.  CPMC has not cited any cases supporting the extension of the qualified privilege in this circumstance.  It may well be that as to certain of the statements made to Dr. Baylor's former patients regarding Dr. Baylor's whereabouts, a common interest indeed exists.  For such statements, Dr. Baylor would have to establish that the statements were made with common law malice.[11]  Without hearing further testimony as to the statements made and the surrounding context, the court declines to rule on the existence of a privilege to statements concerning Dr. Baylor's whereabouts.

As to statements involving Dr. Baylor's integrity or the reason for his termination, it is difficult to see any basis for a claim of privilege.  Indeed, a privilege will not arise where "statements are communicated to third parties who have no duty or interest in the subject matter."  <u>Larimore</u>, 259 Va. at 575, 528 S.E.2d. at 122.  The court is not aware of any duty CPMC owed its patients to explain the reasons for Dr. Baylor's termination, or any interest they

---

[11] While the issue of the existence of the privilege is for the court to decide, the issue of common law malice is an issue for the jury.  Common law malice involves "behavior actuated by motives of personal spite, or ill-will, independent of the occasion on which the communication was made."  <u>Gazette, Inc. v. Harris</u>, 229 Va. 1, 18, 325 S.E.2d 713, 727 (1985).

shared on this subject. The Virginia Supreme Court in <u>Fuste</u> noted the privilege argument in a similar context, but expressed no opinion on the issue. <u>Fuste</u>, 265 Va. at 134, 575 S.E.2d at 862. Defendants cite no precedent or rationale which would justify expansion of the qualified privilege to communications between CPMC and its patients regarding Dr. Baylor's termination. Absent such, the court declines to expand the privilege in this circumstance.

### C. Count V: Virginia Business Conspiracy Act

In Count V, Dr. Baylor alleges a violation of the Virginia Business Conspiracy Act, Virginia Code §§ 18.2-499 and 500, against CPMC, Dr. Kelly and the Samarasinghes. To recover under the statute, a plaintiff must prove: "(1) a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business, and (2) resulting damage to plaintiff." <u>Allen Realty Corp. v. Holbert</u>, 227 Va. 441, 449, 318 S.E.2d 592, 596 (1984).

There are two reasons why this statute has no application to this case. First, a right of action is afforded under Virginia Code § 18.2-499 "only when malicious conduct is directed at one's *business*, not one's *person*." <u>Buschi v. Kirven</u>, 775 F.2d 1240, 1259 (4th Cir. 1985). Injury to personal reputation and interest in employment are clearly excluded from the scope of the statute's coverage. <u>Andrews v. Ring</u>, 266 Va. 311, 319, 585 S.E.2d 780, 784 (2003). Thus, any alleged conspiracy to injure Dr. Baylor's employment at CPMC is not actionable under Virginia Code § 18.2-499. Nor is any claimed injury to his future employment or his future ability to start a practice as a pain medicine physician. <u>See</u> <u>Spencer v. Am. Int'l Group, Inc.</u>, No. 3:08-cv-00591, 2009 WL 47111, at *11 (E.D. Va. Jan. 6, 2009); <u>Mansfield v. Anesthesia Assoc., Ltd.</u>, No. 1:07-cv-941, 2008 U.S. Dist. LEXIS 34732, at *4-5 (E.D. Va. Apr. 28, 2008); <u>Inman v.</u>

Klockner-Pentaplast of Am., Inc., 467 F. Supp. 2d 642, 654 (W.D. Va. 2006); Warner v. Buck Creek Nursery, Inc., 149 F. Supp. 2d 246, 267-68 (W.D. Va. 2001).

Second, a conspiracy requires concerted action between two or more persons, and a single entity cannot conspire with itself. Fox v. Deese, 234 Va. 412, 428, 362 S.E.2d 699, 708 (1987). Under the intracorporate immunity doctrine, acts of corporate agents are acts of the corporation itself, and corporate employees cannot conspire with each other or with the corporation. Bowman v. State Bank of Keysville, 229 Va. 534, 540-41, 331 S.E.2d 797, 801 (1985). Here, Dr. Kelly and the Samarasinghes all served as employees or agents of CPMC; no conspiracy claim may lie against a single entity. Dr. Baylor argues that this doctrine is inapplicable because the individual defendants in this case acted to serve their own personal interests, independent from that of the corporation. Citing three Fourth Circuit cases, American Chiropractic Association v. Trigon Healthcare, Inc., 367 F.3d 212, 224 (4th Cir. 2004), ePlus Technology, Inc. v. Aboud, 313 F.3d 166, 179 (4th Cir. 2002), and Greenville Publishing Co. v. Daily Reflector, Inc., 496 F.2d 391, 399-400 (4th Cir. 1974), Dr. Baylor argues that Dr. Kelly stood to gain from Dr. Baylor's departure from CPMC because that freed up a position for him, and the Samarasinghes personally benefited because "every dollar that CPMC deprived Dr. Baylor of was a dollar in the Samarasinghe's [sic] pockets." Pl.'s Br. in Opp. to Summ. J. (Dkt. # 116) at 42.

But Dr. Baylor's argument ignores the "independent" aspect of the independent personal stake exception. The point of the exception is that there can be no unity of purpose between a corporation and its agents if the agents have a personal stake independent of the interests of the corporation. Here, however, the personal stakes that Dr. Baylor ascribes to Dr. Kelly and the Samarasinghes are congruent with the interests of CPMC. Even if you accept the premise that

Dr. Kelly and the Samarasinghes acted contrary to the interests of Dr. Baylor, their actions were not at odds with the interests of CPMC. In fact, the personal stakes of Dr. Kelly and the Samarasinghes derive from CPMC. Dr. Baylor claims that Dr. Kelly conspired to do him in; however, the alleged mechanism of destruction was Dr. Kelly's work seeing patients as an agent of CPMC. Likewise, there is no suggestion that the Samarasinghes acted contrary to the interests of CPMC. At most, Dr. Baylor suggests that the goal of the conspiracy was to maximize the Samarasinghes' payments from CPMC at his expense. Again, this goal is not independent of the Samarasinghes' relationship to CPMC; rather, it is completely dependent upon it. Every corporate employee has a personal stake in his or her paycheck, but that stake is not independent of the corporation. To accept Dr. Baylor's argument would require the court to read the independent element out of the independent personal stake exception. In so doing, the exception would swallow the rule. See Oksanen v. Page Memorial Hosp., 945 F.2d 696, 705 (4th Cir. 1991); Selman v. Am. Sports Underwriters, Inc., 697 F. Supp. 225, 239 (W.D. Va. 1988).

The Fourth Circuit cases cited by Dr. Baylor do not support such an expansive view of the independent personal stake exception. The independent personal stake exception was first recognized in Greenville Publishing. There, the publisher of a tabloid shoppers guide sued the Greenville, South Carolina local daily newspaper, The Daily Reflector, Inc., alleging that its efforts to publish its own competing shoppers guide constituted a conspiracy in restraint of trade in violation of Section 1 of the Sherman Act and other antitrust violations. In addition to suing The Daily Reflector corporation, plaintiff sued its president. Noting the general rule that a corporation cannot be guilty of conspiring with its officers or agents, the Fourth Circuit nonetheless announced that "an exception may be justified when the officer has an independent personal stake in achieving the corporation's illegal objective." Greenville Publ'g, 496 F.2d at

399. The Fourth Circuit found that a factual issue existed as to whether the exception was applicable in that case because the president of The Daily Reflector also was affiliated with another entity, the Ayden News-Leader, a weekly newspaper in neighboring Pitt County, which competed with the plaintiff. Thus, the court reasoned, if the plaintiff was eliminated as a competitor, the president of the defendant corporation could benefit personally because of his affiliation with the wholly separate weekly newspaper. Id. at 400. Unlike in Greenville Publishing, Dr. Baylor has identified no personal stake any of the defendants have separate and apart from CPMC. As such, this narrow exception does not apply to this case.

The Fourth Circuit's ePlus decision makes this point even clearer. In ePlus, Patricia Aboud used a Canadian corporation, Micro Business Technology ("MBT"), to swindle computer equipment suppliers through what is known as a "bust-out scheme." In such a scheme, a promoter forms a seemingly legitimate corporation and, for a time, pays its bills in an effort to lure creditors into extending larger and larger lines of credit. The schemers then use the inflated credit lines to obtain merchandise from suppliers, sell the merchandise at fire sale prices and loot the corporation of its assets. Ultimately, the corporate shell tumbles into bankruptcy, and the creditors are faced with huge unpaid debts. ePlus, 313 F.3d at 171. The Fourth Circuit easily applied the independent personal stake exception to the facts in ePlus, as it is clear that the interest of the promoter, Aboud, was different from that of the corporate shell. Indeed, it was only in the failure of the corporation that the individual promoter succeeded. As the court explained:

> Aboud stood to gain from the MBT bust-out scheme, and her personal stake was wholly separate from her connection to MBT. In fact, Aboud had no interest in seeing MBT profit: the point of the MBT bust-out scheme was to send the corporation into bankruptcy. In siphoning money out of MBT, Aboud personally

profited at MBT's expense.  In such a situation, the "personal stake exception" squarely applies.

Id. at 179-80.

The situation with CPMC in this case is just the opposite.  Dr. Kelly and the Samarsinghes' personal stakes are dependent on that of CPMC.  Only when CPMC succeeds do they succeed.  The personal stake exception simply does not apply here.  See Oksanen, 945 F.2d at 705-06; Am. Chiropractic Ass'n, 367 F.3d at 224-25.

Additionally, Dr. Baylor has not identified any case applying the independent personal stake exception to a case brought under the Virginia Business Conspiracy Act.  Indeed, a number of Virginia cases have rejected application of this exception, reasoning that it has not been adopted by the Virginia Supreme Court.  See White v. Potocska, 589 F. Supp. 2d 631, 660 (E.D. Va. 2008); Phoenix Renovation Corp. v. Rodriguez, 461 F. Supp. 2d 411, 429 (E.D. Va. 2006); Softwise, Inc. v. Rana Goodrich, M.D., P.C., 63 Va. Cir. 576, 578 (Roanoke City 2004); Little Professor Book Co. v. Reston North Point Vill. Ltd. P'ship., 41 Va. Cir. 73, 79 (Fairfax County 1996).

As there is no genuine issue of material fact as to the requisite multiplicity of actors required for a conspiracy, and the independent personal stake exception does not apply, Count V must be dismissed.

### D.  Count VI: Tortious Interference

In Count VI, Dr. Baylor asserts that each of the defendants tortiously interfered with his contract with CPMC and with his existing and prospective business relationships with his patients.  Virginia law permits recovery for such claims where a party can show "(1) the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) defendant's knowledge of the relationship or expectancy; (3) a reasonable

certainty that absent defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy; and (4) damage to plaintiff." <u>Glass v. Glass</u>, 228 Va. 39, 51, 321 S.E.2d 69, 76-77 (1984); <u>see also</u> <u>Commercial Bus. Sys., Inc. v. Halifax Corp.</u>, 253 Va. 292, 300, 484 S.E.2d 892, 896 (1997). Dr. Baylor cannot establish these elements.

First, as regards the Employment Agreement, it is well-established that a party cannot be found to have tortiously interfered with its own contract. "[I]t is axiomatic that a party cannot interfere with his own contract. Rather, a tortious interference claim requires the existence of three actors – the two parties to the contract and a third-party who interferes with, or induces one of the parties to breach, that contract." <u>Storey v. Patient First Corp.</u>, 207 F. Supp. 2d 431, 448 (E.D. Va. 2002). However, the exception to this axiom applies when a plaintiff can establish that the agent of a party to the contract was acting outside the scope of his employment in tortiously interfering with the contract. <u>Wuchenich v. Shenandoah Mem'l Hosp.</u>, 215 F.3d 1324, 2000 U.S. App. LEXIS 11557, at *55 (4th Cir. 2000); <u>Fox</u>, 234 Va. at 428, 362 S.E.2d at 708. Dr. Baylor has presented no evidence that any of the defendants acted outside of the scope of their employment with CPMC in connection with his termination.[12] <u>See</u> <u>Ashco Int'l, Inc. v. Westmore Shopping Ctr. Assocs.</u>, 42 Va. Cir. 427, 433-35 (Fairfax County 1997); <u>see also</u> discussion, <u>supra</u>, § III.C. As such, the claimed interference with the Employment Agreement is not actionable.[13]

---

[12] The cases cited by Dr. Baylor, <u>Britt Constr., Inc. v. Magazzine Clean LLC</u>, 69 Va. Cir. 478, 480-81 (Loudoun County 2006), and <u>Wuchenich</u>, 215 F.3d 1324, 2000 U.S. App. LEXIS 11557, at *55-56, are not to the contrary. Each of those cases were decided on the pleadings, and were not decided on summary judgment. Dr. Baylor has had years to develop evidence to suggest that the Samarasinghes and Dr. Kelly acted outside of the scope of their employment with CPMC, and has presented none.

[13] Even if Dr. Kelly is viewed as some sort of interloper into CPMC's practice, there is no evidence that Dr. Kelly did anything to cause the termination of the Employment Agreement other than continuing to work at CPMC after Dr. Baylor returned. Dr. Baylor has identified no intentional misconduct on Dr. Kelly's part leading to the termination.

Second, as regards the claimed business expectancy in continuing to treat the patients he saw while employed at CPMC, Dr. Baylor cannot establish that this expectancy rises to the level of a probable future economic benefit.  "Virginia law requires objective proof of a probability of future economic benefit, not just a hope or a belief that a business relationship will continue."  Am. Chiropractic, 367 F.3d at 228.  There is no such proof in this case.  As was the case in American Chiropractic, CPMC's patients, including those seen by Dr. Baylor, "have the ability and the right to terminate their relationship at any time, and [Dr. Baylor] has not introduced any evidence showing more than a hope or belief that, generally speaking, patients would continue seeking treatment from [him]."  Id.  Because Dr. Baylor has failed to show that he has an objective, valid business expectancy with a probability of future economic benefit, summary judgment is appropriate.

### E.  Count VII:  Uniformed Services Employment and Reemployment Rights Act

Finally, the claims asserted in Count VII, alleging violations of USERRA, 38 U.S.C. § 4301 et seq., must go to trial.  Under USERRA, an employee who is called up for military duty for a period between 30 and 181 days may not be terminated within 180 days of his return to employment "except for cause."  38 U.S.C. § 4316(c).  Dr. Baylor alleges that CPMC did not have cause to fire him, and contends that it "seized on this one-time verbal slip as a pretext for firing Dr. Baylor."  Pl.'s Br. in Opp. to Summ. J. (Dkt. #116), at 52.  CPMC asserts that Dr. Baylor was terminated for repeated acts of unprofessional conduct, culminating in the expletive he uttered to Dr. Samarasinghe on May 1, 2006.  "In a discharge based on conduct, the employer bears the burden of proving that it is reasonable to discharge the employee for the conduct in question, and that he or she had notice, which was express or can be fairly implied, that the conduct would constitute cause for discharge."  20 C.F.R. § 1002.248(a).  "Because employers

have the burden of proving that the discharge was reasonable, it is difficult for employers to achieve summary judgment on claims under § 4316(c)."  Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 308 (4th Cir. 2006).  In short, whether Dr. Baylor was terminated for cause is a quintessential question of fact for the jury to decide.

Dr. Baylor also asserts that CPMC violated USERRA's anti-discrimination provision, which makes it unlawful for any employer to base an adverse employment action on an employee's performance of military service or to retaliate against him for assertion of his USERRA rights.  38 U.S.C. §§ 4311(a) and (b).  An employee making a USERRA discrimination claim bears "the initial burden of showing by a preponderance of the evidence that the employee's military service was 'a substantial or motivating factor' in the adverse employment action."  Sheehan v. Dep't of the Navy, 240 F.3d 1009, 1013 (Fed. Cir. 2001)  "To establish a certain factor as a motivating factor, a claimant need not show that it was the sole cause of the employment action, but rather that it is one of the factors that a truthful employer would list if asked for the reasons for its decision."  Bunting v. Town of Ocean City, No. 10-1140, 2011 U.S. App. LEXIS 1935, at *5 (4th Cir. Jan. 31, 2011).  "If this requirement is met, the employer then has the opportunity to come forward with evidence to show, by a preponderance of the evidence, that the employer would have taken the adverse action anyway, for a valid reason."  Sheehan, 240 F.3d at 1013.  As the court in Sheehan noted:

> Circumstantial evidence will often be a factor in these cases, for discrimination is seldom open or notorious.  Discriminatory motivation under the USERRA may be reasonably inferred from a variety of factors, including proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees

compared to other employees with similar work records or offenses.

Id. at 1014.

Baylor asserts that his military service and assertion of rights under USERRA both played a role in his discharge, and there is a genuine issue of material fact on this claim. Whether Dr. Baylor's termination resulted from his military service or his assertion of his rights under USERRA are likewise questions for the jury. See Bunting, 2011 U.S. App. LEXIS 1935, at *7-8.

## IV. CONCLUSION

For the reasons set forth herein, defendants' motions for summary judgment (Docket Nos. 98, 101 and 103) are **GRANTED in part** and **DENIED in part**. The court **GRANTS** summary judgment as regards Counts V and VI and **DENIES** summary judgment as regards Counts I, II, III, IV and VII. Thus, remaining for trial are the following issues - Counts I and II: Breach of Employment Contract; Counts III and IV: Defamation; and Count VII: Violations of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301 et seq. Counts I, II and VII will proceed against defendant CPMC. Counts III and IV will proceed against all defendants.

Entered: April 6, 2011

/s/ Michael F. Urbanski

Michael F. Urbanski
United States Magistrate Judge